**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5491-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAHMAD GREEN, a/k/a
JAHMAD GREE,

     Defendant-Appellant.

_____

Submitted October 28, 2019 – Decided   February 18, 2020

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 15-04-0352.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele A. Adubato, Designated Counsel, on the brief).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Ali Y. Ozbek, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After trial with codefendants, Francis Brace and Gregory Oliver, Defendant Jahmad Green appeals from his conviction by jury and sentence for first-degree aggravated manslaughter of Jaleek Burroughs, N.J.S.A. 2C:11-4(a)(1), as a lesser-included offense of first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2), N.J.S.A. 2C:2-6, and N.J.S.A. 2C:2-3(d) (count one); two counts of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (counts four and ten); second-degree aggravated assault of Alaysia Chambers, N.J.S.A. 2C:12-1(b)(1), as a lesser-included offense of first-degree attempted murder, N.J.S.A. 2C:5-1, N.J.S.A. 2C:11-3(a), and N.J.S.A. 2C:2-3(d) (count eight); and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count five).  Both victims were shot in an early-morning incident on August 31, 2014.  The State alleged defendant and his codefendants shot at a gold Ford Taurus from which shots were also fired.  Burroughs was shot in the head and pronounced dead on the sidewalk where he fell.  Chambers, who was seated in Brace's BMW in which he had earlier picked her up, was also shot in the head; she survived her wound.  Neither of the victims were the intended targets of the shootings.

On appeal, defendant argues:

POINT I

THE TRIAL COURT'S DENIAL OF DEFENDANT'S MOTION FOR JUDGMENT OF ACQUIT[T]AL BOTH PRE[-] AND POST-VERDICT WAS ERROR.

POINT II

THE TRIAL JUDGE ERRED IN ADMITTING INTO EVIDENCE THE PRIOR STATEMENT OF [JOCELYN] SUGGS AS THE STATE FAILED TO SATISFY THE STANDARDS OF STATE V. GROSS.[1]

POINT III

COMMENTS MADE BY THE PROSECUTOR DURING HIS SUMMATION CONCERNING FACTS NOT IN EVIDENCE WAS GROSSLY PREJUDICIAL AND DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT IV

THE TRIAL COURT'S INADEQUATE RESPONSES TO THE INCOMPLETE AND ERRONEOUS JURY QUESTION DURING DELIBERATIONS WAS ERROR AND DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT V

THE AGGREGATE SENTENCE OF TWENTY-SEVEN (27) YEARS WITH [EIGHTY-FIVE PERCENT] PAROLE INELIGIBILITY WAS EXCESSIVE AND SHOULD BE MODIFIED AND REDUCED.

For the reasons we now discuss, we affirm.

---

[1] 216 N.J. Super. 98 (App. Div. 1987), aff'd, 121 N.J. 1 (1990).

3

# I.

Defendant first contends the trial judge erred in denying the motions for judgment of acquittal, made after the State and defense rested, R. 3:18-1, and then again after the verdict was returned, R. 3:18-2. The same standard applies to all three motions:

> The trial judge must decide whether the evidence is sufficient to warrant a conviction. More specifically, the trial judge must determine whether the evidence, viewed in its entirety, be it direct or circumstantial, and giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt. On such a motion the trial judge is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.
>
> [State v. Kluber, 130 N.J. Super. 336, 341-42 (App. Div. 1974) (citations omitted).]

However, "'the State's right to the benefit of reasonable inference cannot be used to reduce the State's burden of establishing the essential elements of the offense charged' and defendant's identification as the perpetrator, by proof beyond a reasonable doubt." State v. Bain, 212 N.J. Super. 548, 553 (App. Div. 1986) (quoting State v. Martinez, 97 N.J. 567, 572 (1984)). In ruling on the motions, the trial judge perpended evidence that twenty-three days after the shooting, a

4

homeowner reported observing someone running down the street toss something into his yard, where he subsequently discovered a 9mm Springfield XD handgun. Police officers recovered the gun and also discovered the gun's magazine nearby. Defendant's fingerprint was found on the magazine. The homeowner subsequently identified defendant from a photo array as the man he saw running past his house. Ballistics testing matched the Springfield handgun to shell casings found at the crime scene.

The judge also considered statements taken by Paterson police detectives who twice interviewed Jocelyn Suggs. Video recordings of both interviews—the first, four days after the shooting and the second on December 3, 2014—were admitted into evidence and played for the jury.[2] In the statements, Suggs explained to the detectives that a large crowd of people had congregated in the area around a parked BMW in which Chambers sat prior to the shooting. Suggs was warned there was going to be a shooting. Someone retrieved a gun from the BMW's interior. She placed Brace at the scene, at the side of the BMW. The first shots were fired from the gold Taurus as it drove by the group gathered near the BMW. She observed Brace return fire with the smaller of the guns

---

[2] The statements were admitted as inconsistent statements under N.J.R.E. 803(a)(1), per the trial judge's ruling after conducting a hearing pursuant to Gross, 216 N.J. Super. at 110.

used.  Suggs told detectives an individual named Jahmad was at the scene, and that she heard him state that he had a gun.  Suggs also told detectives a week or two after the shooting, she heard Oliver state that "he shot him in the eyeball."

The trial judge denied defendant's motions, finding:

> A reasonable inference can be drawn from the evidence presented at trial, including . . . Suggs'[s] statement that someone she knows as Jahmad had a gun, that . . . [d]efendant was found with a gun less than one month after the shooting, that his fingerprints were on the magazine of that gun, and that shell casings matching that gun were found at the scene of the shooting. Taking these facts, it is not unreasonable for a jury to draw inferences that a nexus exist[s] between . . . [d]efendant and the shooting.
>
> . . . .
>
> As such, giving the State the benefit of all favorable inferences, the jury could have reasonably concluded that [defendant] was the Jahmad referred to by . . . Suggs and that the ballistic evidence could connect him to the shooting, there is sufficient evidence to sustain a guilty verdict.  The three defendants were charged under a theory of accomplice liability.  Thus, the evidence connecting [defendant] to the shooting can be attributed to the common purpose shared by the three co[]defendants.

Defendant argues he was not identified as a shooter beyond a reasonable doubt.  Specifically, he contends Suggs merely indicated an individual named Jahmad was at the scene without definitively identifying this individual as

defendant, through photographs or otherwise. Although his trial counsel conceded defendant's fingerprints were found on the magazine, defendant contends his fingerprints were not found on any shell casings recovered from the crime scene, nor was there any evidence indicating how long the casings had been at the location before they were found. Finally, defendant contests the trial judge's conclusion that, because defendant was charged on a theory of accomplice liability, "the evidence connecting defendant to the shooting can be attributed to the common purpose shared by the co[]defendants."

On appeal, we apply the same standard as the trial court to decide if the motions for acquittal should have been granted. State v. Moffa, 42 N.J. 258, 263 (1964). Under that lens, the record reveals sufficient evidence to support a jury's finding that the State proved beyond a reasonable doubt that defendant was guilty of aggravated manslaughter as an accomplice. A person is an accomplice of another if: "[w]ith the purpose of promoting or facilitating the commission of the offense; he (a) [s]olicits such other person to commit it; [or] (b) [a]ids or agrees or attempts to aid such other person in planning or committing it." N.J.S.A. 2C:2-6(c)(1).[3]

---

[3] The statute also provides a third avenue of accomplice liability, not applicable here: "(c) [h]aving a legal duty to prevent the commission of the offense, fails to make proper effort so to do." N.J.S.A. 2C:2-6(c)(1).

The combination of evidence:  placing defendant at the scene with a gun; the identification of defendant as the person who discarded the 9mm Springfield XD handgun; fingerprint evidence linking defendant to the 9mm Springfield XD handgun, and linking that gun to the casings found at the crime scene right after the shooting, together with the inferences that can be reasonably and logically drawn from that evidence, provides sufficient evidence that defendant was present during the crimes and, together with his codefendants, participated in the shooting that resulted in Burroughs's death and Chambers's injury.  See State v. Bielkiewicz, 267 N.J. Super. 520, 525-27, 535 (App. Div. 1993) (holding that where two co-defendants fired and only one shot caused the victim's death, the judge was obligated to charge accomplice-liability murder).

We determine defendant's brief argument that the trial judge erred in denying his post-verdict motion for a new trial to be without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

II.

As we noted, the trial judge conducted a hearing to determine whether Suggs's prior statements were admissible under N.J.R.E. 803(a)(1).  Gross, 216 N.J. Super. at 110; accord State v. Brown, 138 N.J. 481, 539 (1994).  N.J.R.E. 803(a)(1) provides a hearsay exception for prior inconsistent statements of a

witness that would have been admissible if made by the declarant while testifying. A statement is deemed inconsistent if the witness feigns a lack of recollection or recants his or her testimony. State v. Savage, 172 N.J. 374, 404-05 (2002). If the statement is offered by the party calling the witness, it is admissible as substantive evidence if it is "contained in a sound recording or in a writing made or signed by the declarant-witness in circumstances establishing its reliability[.]" N.J.R.E. 803(a)(1). The party offering the statement has the burden of proving the reliability of the prior statement by a preponderance of the evidence. Gross, 121 N.J. at 7, 15-17. The trial judge's role "is not to determine the credibility of the out-of-court statement. Rather it is for the judge to determine from the proofs whether the prior statement was made or signed under circumstances establishing sufficient reliability that the factfinder may fairly consider it as substantive evidence." Gross, 216 N.J. Super. at 110.

Defendant avers the trial judge erred in admitting Suggs's statements because: Suggs was in custody when she provided her statements, having been told she was not free to leave during the first interview and having been picked up by police in a marked police vehicle from her job before the second interview; "she was high every[]day on weed and mollies"; she was under duress and pressured and coerced, having been told she could not leave until she told police

what they "wanted to hear"; she had a motive to fabricate, i.e., to leave police custody; she was offered inducements for her statements in the form of favorable letters to her employer, offers to help find a job and payment of $20; she was not told her statements was recorded or the use to which her statements would be put; and her statements were not corroborated.

We review the evidentiary rulings of the trial court under the abuse of discretion standard. State v. Harris, 209 N.J. 431, 439 (2012); State v. Merritt, 247 N.J. Super. 425, 434 (App. Div. 1991) (applying abuse of discretion standard to admission of prior inconsistent statements). We also defer to the factual findings of the trial judge made after an evidentiary hearing, if those findings are supported by sufficient credible evidence in the record. State v. Robinson, 200 N.J. 1, 15 (2009). We further extend that deference to the trial court's "factual findings based on a video recording" in order to ensure trial courts that "have ongoing experience and expertise in fulfilling the role of factfinder," remain "'the finder of the facts,' in the absence of clear error." State v. S.S., 229 N.J. 360, 380-81 (2017) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment).

During the Gross hearing, the judge heard testimony from Suggs and one of the detectives who conducted both interviews, and he viewed the video

statements. Suggs testified: she could not remember anything about the events of August 31, 2014, besides there was a shooting; she felt pressured when she provided statements to the police; her prior statements were not accurate; and she wished to recant both statements. Suggs also testified she routinely drank and ingested "mollies" and "weed" at the time she provided the statements to police, and that she was high during both interviews. Finally, Suggs said she was not aware that either of her statements were being recorded.

The trial judge considered Suggs's contentions that she could not recall making the statements, the statements were not truthful, and she was under the influence, but found her "lapse of memory" was feigned.[4] Thus, the judge ruled the videotaped statements were inconsistent, Savage, 172 N.J. at 404-05, meeting the threshold requirements of N.J.R.E. 803(a)(1).

The trial judge, in determining whether the statements were given "in circumstances establishing its reliability," N.J.R.E. 803(a)(1)(A), reviewed each of the fifteen factors enumerated in Gross, 216 N.J. Super. at 109-10:

> (1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise

---

[4] Besides the judge's independent finding, codefendant Oliver's counsel conceded "[i]t does appear [Suggs] was feigning."

the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion or a summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducements or coercion for the making of the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement and (15) the presence or absence of corroborating evidence.

The judge found: as to factor one, Suggs was present at the scene of the shooting, "recognized and in court . . . identified the three defendants," and knew Chambers; and as to factors two, three and six, the statements were given to two detectives in interview rooms "with regard to an investigation relating to the death of . . . Burroughs and the attempted murder of . . . Chambers[.]" The judge found those factors supported the statements' reliability.[5]

The judge carefully considered whether Suggs was in custody or a target of the investigation, the fourth factor, noting the warrant for her arrest stemming

---

[5] Defendant conceded in his merits brief, "it is true that some of the Gross factors were present": factors one, two, three, six, seven, eight and ten.

from unpaid fines. The judge found Suggs was never handcuffed, Suggs "clearly indicated she didn't feel that she was a target or a suspect," and she was released after the statements. The judge observed Suggs's demeanor and responses to questioning during the interview and found, although she perceived she was in a "pressured environment," the totality of the circumstances "weighed in favor of . . . reliability" as to this factor.

The judge's observations of the video also informed his decision that, contrary to Suggs's testimony that she was under the influence during the statements, "[s]he appeared to be very attentive[,] . . . drew diagrams[,] [and m]ade appropriate corrections[.]" Her description of events and even her facial gestures also led the judge to determine that Suggs "had a good grasp of what[ was] going on" during the interviews. He considered this factor—five—favored the statements' reliability.

The judge did not find factor seven applicable because Suggs neither incriminated nor sought to exculpate herself. He also found, in connection with the eighth and tenth factors, although the statements were not written in her hand, Suggs was clearly depicted on the videos, and except for a ten or twelve

minute gap "where it was very hard, difficult for the [judge] to figure out what was being said,"[6] the balance of the sound recording was admissible.

The judge devoted considerable attention to factor nine, ultimately finding the factor favored a finding of reliability. The judge found Suggs clearly did not want to be interviewed by the detectives. Reiterating that his review of the videos revealed

> the nature of these interviews was tense, was pressured, but did not amount to a full[-]fledged, what I consider to be an interrogation that may have caused the will of this witness to be broken to a point where she was giving information or providing information to the detectives under stress or under such a duress that I would call it . . . an involuntary statement.

As to the related factor twelve, the judge repeated his prior finding that the circumstances were pressured. He also considered defendant's contention that police offered Suggs $20 if she did not sleep well after telling detectives the truth. During an exchange with one of the detectives, after Suggs told the detective she had not been sleeping well, the detective told her: "And that's what I'm trying to tell you, if you tell us exactly what happened, I guarantee you tonight you['ll] sleep. If not, I'll give you [$]20. She'll probably lie to me, like[, ']I didn't sleep well.['] No, but I'm serious. You'll sleep well." That record

---

[6] The judge ruled that portion of the statement was inadmissible.

evidences that the detective did not offer money in exchange for a statement but offered a bet—rhetorically, or in jest—that she would feel better if she aided their investigation by disclosing what she witnessed.

The judge also considered defendant's contention, mirroring his present argument, that the detectives told Suggs "she was not free to leave" and "[h]er ability to leave was contingent on telling the police what they wanted to hear." In finding Suggs's statements were voluntary, the judge determined

> even [if] the detective's statement may be characterized as that she was not permitted to go home unless she provided statements that they were looking for, that statement, if we follow the detective's statement, was you can go home and we can all go home.
>
> If we take those statements together, it does not imply that you're not going home unless you do what I'm asking you to do.

We see no reason to disturb the judge's evidence-based findings. The context of the conversation does not support defendant's contention she was coerced and pressured. It is evident from the record the detectives believed Suggs was reluctant and withholding information, and they wanted to prolong the interview until she was forthcoming with a complete and truthful account of what she witnessed. When the detective told her she could not leave, he explained:

A-5491-16T1

> Jocelyn, we're close, but not that close. We've got to go to, to the bottom of it. You've got to tell us what went down, so we can finish this, so you can go home and we can go home. All we're doing is trying to catch somebody. . . . You saw what happened. You're basically telling us – most of the stuff you're telling them is stuff that you're hearing from the people that she told, saying this happened . . . that happened. You don't need that because you were there. You saw what happened.

> . . . .

> As I told you, in five minutes you could have told us, if you went straight to the point what happened, five minutes this conversation would be over. [I]f you would have told us exactly how everything went down when you were there and when you saw what happened.

The detectives did not pressure Suggs to say anything particular, only to tell the truth. And the interview's length was "about three hours"; Suggs was not kept for an inordinate amount of time after that exchange.

Although the judge's decision regarding factor eleven seems to have conflated Suggs's motive to fabricate during the interview with her motive during the evidentiary hearing, the judge did find "there is no presence of a motive to fabricate other than her express desire not to be involved, not to testify[.]" As confirmed by the judge's analysis of factor fifteen, that finding applied to Suggs's mindset during the interview and during the evidentiary

16

hearing, supporting the judge's conclusion that Suggs had no motive to fabricate and the factor favored a finding of reliability.

The judge found Suggs did not know she was being videotaped and accorded "medium weight in considering the reliability" under factor thirteen. He also left "the inherent believability or lack of believability of the statements" under factor fourteen to the jury, but found the statements reliable under this factor in compliance with our holding in Gross that the trial judge's role "is not to determine the credibility of the out-of-court statement," but "to determine from the proofs whether the prior statement was made or signed under circumstances establishing sufficient reliability that the factfinder may fairly consider it as substantive evidence." 216 N.J. Super. at 110.

As to the fifteenth factor, the judge, in addition to finding Suggs's reluctance to testify was corroborated, determined he was not presented with sufficient evidence "to rule either in favor or against the reliability" of the statements. The State argues Suggs's statements are corroborated by evidence that: Suggs stated an individual named Jahmad had a gun at the scene of the shooting; police found a gun, connected to the shooting by ballistics evidence with defendant's fingerprints on it; and a homeowner of the property where the gun was found identified defendant from a photo array as the man who threw a

17

dark object on his property. Although the judge credited Suggs's statements regarding defendant's presence at the crime scene and admission he had a gun in denying the acquittal motions, he did not find these facts from the evidence in connection with the Gross hearing. As such, we will not consider that evidence.

Although not directly addressed in the judge's analysis, we are not persuaded by defendant's arguments that Suggs's custody was evidenced by her transportation by police to the second interview, and that the detective's offer to have letters submitted to her employer, and other offers of assistance with employment, coerced her statement, rendering it unreliable. The second statement was only about fifty minutes in length and Suggs was not held after it concluded. And there is no evidence the offers of work-related assistance were an attempt to coerce Suggs's statement. Indeed, she did not accept the offer. As the trial judge commented after viewing the videos, "although I do not condone everything that . . . occurred in that interview room, do they amount . . . to such an environment where all of the statements that this witness made would be deemed involuntary? I don't reach that conclusion."

"[A] trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion[.]'" Harris, 209 N.J. at 439 (alteration in

original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). Accordingly, the trial court's decision to admit evidence should only be overturned if it was "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigration and Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)). Our review of the record fails to provide us with any reason to disturb the trial judge's factual findings, analysis of the Gross factors, or conclusion that Suggs's statements were admissible as substantive evidence under N.J.R.E. 803(a)(1).

## III.

Defendant argues two comments made by the prosecutor during summation denied him a fair trial. The first was made at the beginning of the State's closing remarks: "Jaleek Burroughs'[s] favorite color was green. On August 31st of 2014, however, he died in a halo, a bloody halo of his own blood." Defendant also contends:

> After defendant's objection to the [p]rosecutor's statement that he owned the 9mm gun, the [p]rosecutor stated: "He says he did not own the gun. He possessed it on September 23, 2014. There's circumstantial evidence he possessed it on September 23, 2014. He possessed it, there's no dispute about that. His own counsel acknowledged that he possessed the gun."

Defendant advances "[t]hese opinion statements . . . were relating to facts not in evidence and were used to generate sympathy for the victim and were totally improper."

Before we review the prosecutor's remarks, we note defendant incorrectly presented the prosecutor's words. After the prosecutor told the jury the Springfield XL handgun was owned by defendant, his counsel immediately objected.

In an in-chambers conference, defendant's counsel voiced that there was no evidence defendant owned the gun; "the only clear evidence is that he possessed it on September 23[,] 2014. They can if they want infer and the prosecutor can argue that that also means that he possessed it on August 31[] . . . . But ownership and possession are two completely different things." The prosecutor replied, "If you like, I'll correct it myself. I'm conceding." When defendant's counsel was asked by the judge, "what is it that you're seeking," counsel said:

> I'll leave it up to [the prosecutor] to decide how he wants to do it. I'm not going to say that he needs to correct it unless he wants to. But if he chooses not to, I need Your Honor to say something. I need to make it clear to the jury that there's a difference between ownership and possession.

Once before the jury, contrary to the version set forth in defendant's merits brief, the prosecutor stated: "I'm very sorry, ladies and gentlemen. He didn't own that gun. He possessed it on September 23[,] 2014. There's circumstantial evidence that he had possessed it on August 31[,] 2014. He possessed it. There's no dispute about that. His own counsel acknowledged that. He possessed that gun."

"[T]he test for determining whether prosecutorial misconduct constitutes reversible error is whether the misconduct 'was so egregious that it deprived defendant of a fair trial.'" State v. DiFrisco, 137 N.J. 434, 474 (1994) (alteration in original) (quoting State v. Pennington, 119 N.J. 547, 565 (1990)). "So long as he stays within the evidence and the legitimate inferences therefrom the [p]rosecutor is entitled to wide latitude in his summation." State v. Mayberry, 52 N.J. 413, 437 (1968). Thus, "[p]rosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82 (1999).

"In determining whether a prosecutor's misconduct was sufficiently egregious, an appellate court, 'must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred.'" Id. at 83 (quoting State v. Marshall, 123 N.J. 1, 153 (1991)).

The court should examine such factors as whether defense counsel made a timely objection, whether the remark was withdrawn promptly, whether the trial judge ordered the remarks stricken, and whether the judge instructed the jury to disregard them. State v. Ramseur, 106 N.J. 123, 322-23 (1987). Generally, improper remarks will not be deemed prejudicial if no objection was made, because "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made," and "also deprives the court of an opportunity to take curative action." Frost, 158 N.J. at 83-84.

Because no objection was made to either of the prosecutor's ultimate remarks, we will not reverse unless the error was "clearly capable of producing an unjust result," R. 2:10-2; that is, unless there is a "reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached," State v. Macon, 57 N.J. 325, 336 (1971). We do not perceive that to be the case.

While we agree the prosecutor's description of defendant's favorite color was not based on any evidence adduced at trial, that isolated, innocuous statement was not capable of producing an unjust result. See Marshall, 123 N.J. at 161 (holding defendant was not deprived of a fair trial where the prosecutor's "inflammatory and highly emotional" remarks did not pertain to "a critical and contested issue of fact"). And the prosecutor's description of the "bloody halo,"

22

although marginally immoderate, could have been fair comment on the officer's testimony that, upon arrival at the crime scene, he "saw a male down on the sidewalk bleeding heavily." He described the victim's condition as "laying face up on the sidewalk bleeding from his head."

The prosecutor's corrected statement regarding defendant's possession of the weapon was based on the record evidence placing defendant at the scene with a gun; identifying defendant as the person who discarded the 9mm Springfield XD handgun; linking defendant's fingerprint to the 9mm Springfield XD handgun, and linking that gun to the casings found at the crime scene right after the shooting.

We further note that the prosecutor was responding to defendant's counsel's closing remarks cautioning the jury that the prosecutor was "going to try and convince you . . . that because on September 23[,] 2014 [defendant] was in possession of a gun that ultimately was somehow linked to [the crime scene,]" which was enough to establish his possession at the time of the shooting. After defendant's counsel reviewed the foregoing evidence, and explained why that evidence was insufficient to link defendant to the gun when the crimes occurred, he told the jury: "Why am I bringing this stuff out? Because again, the State is going to try to argue to you . . . this is circumstantial evidence. This is

circumstantial evidence that proves [defendant] was there [at the crime scene] three weeks earlier."  After further argument why the evidence did not show defendant possessed the gun on August 31, 2014, his counsel argued:

> So, ladies and gentlemen, is that enough circumstantial evidence, inferences[?]  That's what the State is going to be arguing to you.  And let me say this.  That's not a substitute for proof beyond a reasonable doubt.  You can't say well they don't have the proof, but we have an inference, so that's good enough.

Defendant's counsel later continued his argument against the drawing of an inference, telling the jury, "We're dealing with [a] much more serious and a complex issue here on the issue of whether [defendant] possessed that weapon because he had it on September 23[], possessed it on August 31[]."  Concluding argument on that issue, he warned:

> So don't be fooled.  And again, I'm not saying that [the State] is going to try and fool you.  But don't be fooled by this concept, the concept of circumstantial evidence or inferences crossing over the necessity that there be proofs beyond a reasonable doubt, proof beyond a reasonable doubt that [defendant] was at that scene on August 31[,] 2014.
>
> Like I said . . . there's no proofs as to that, let alon[e], again, having the gun and firing it.  I'll go right to the heart, like I told you, he wasn't there.  There were no proofs that he was there.

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Frost, 158 N.J. at 82. "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." Id. at 83. Guided by those polestars, we conclude the prosecutor's closing statement did not deprive defendant of a fair trial.

IV.

We are constrained to further correct defendant's erroneous account regarding the jury question to which he argues the trial judge inadequately responded. The judge read one of a series of questions first posed by the jury: "Is [August 31, 2014] still pertinent to [September 23, 2014] with regards to unlawful possession of a weapon? In parenthes[e]s, regarding [defendant]." After addressing some of the jury's other questions, the judge answered,

> As to [the] . . . second question that you . . . sent, . . . I'm just simply going to ask you to clarify as to the question because I am not sure I understand the question properly, so maybe you can simply discuss among yourselves - - no, I don't need a verbal response. You're going to [go] back into the jury room, you're going to talk among each other, and then you will send a written note to me.

The jury later responded with another series of questions, among which was: "Question [n]umber [two], is the gun that [defendant] discarded on

25

[September 23, 2014] applicable to the crime on [August 31, 2014] as to [defendant] being charged with unlawful possession of a weapon on [August 31, 2014]?" In answer, the judge said "With regard to [q]uestion [n]umber [two], is the gun that [defendant] - - that's a question for you to decide, and that's a question that you will be deciding as jurors, that same question."

Defendant argues the trial court failed to explain to the jury how the evidence regarding the discovery of the gun on September 23, 2014, and the gun's link to defendant should have been utilized, contending without such guidance as to how the testimony and evidence was to be used, "the jury could have concluded that defendant's possession of the gun on September 23, 2014, without more, was definitive proof of his guilt in the shooting on August 31, 2014."

In reviewing a trial court's response to a jury question, an appellate court's "task is to determine whether the trial court erred in its response and, if so, whether that 'error undermines our confidence that the deliberative process produced a just result and the conviction must be reversed.'" State v. Lykes, 192 N.J. 519, 537 (2007) (quoting State v. Parsons, 270 N.J. Super. 213, 224-25 (App. Div. 1994)). "An appropriate judicial response requires the judge to read

the question with care to determine precisely what help is needed."  Parsons, 270 N.J. Super. at 221.

We determine the trial judge did just that.  He first "clarif[ied] the jury's inquiry by ascertaining the meaning of its request," after receiving the jury's first ambiguous question.[7]  Savage, 172 N.J. at 394.  The second question did not ask for clarification on the law; it asked the judge a fact question that was fully framed by that portion of defendant's counsel's summation that we have cited at length in the previous section.  In essence, the jury asked the judge if defendant's possession of the gun on September 23 was "applicable" to the State's contention that he unlawfully possessed the gun on August 31.  Any answer to that question, other than that given by the court, would have invaded the province of the jury which had to decide if the State's circumstantial evidence was sufficient to prove the crime beyond a reasonable doubt or if, as defense counsel argued, the inferences drawn from the State's evidence were insufficient to prove that crime.

While the judge could have articulated its answer thusly, the answer given, to which no objection was posed, was not capable of producing an unjust result.

---

[7]  Defendant, in his merits brief, describes the court's response to the second question as "inadequate, incomplete and erroneous[.]"

See R. 2:10-2; State v. Torres, 183 N.J. 554, 564 (2005).[8] Not any possibility

of an unjust result is sufficient; the possibility must be "sufficient to raise a

reasonable doubt as to whether the error led the jury to a result it otherwise might

not have reached." Macon, 57 N.J. at 336. In the context of jury instructions,

plain error is "legal impropriety in the charge prejudicially affecting the

substantial rights of the defendant and sufficiently grievous to justify notice by

the reviewing court and to convince the court that of itself the error possessed a

clear capacity to bring about an unjust result." State v. Hock, 54 N.J. 526, 538

(1969).

The question posed by the jury involved only the possession of a weapon

charge, not the more complex charges of murder and attempted murder, or the

lesser included offenses of those charges. Further, the jury did not pose another

related question or ask for clarification. The judge's instruction did not rise to

plain error.

V.

Defendant was sentenced to a twenty-year prison term, subject to an

eighty-five percent period of parole ineligibility pursuant to the No Early

---

[8] "Our rules provide that a defendant waives the right to contest an instruction on appeal if he does not object to the instruction." Torres, 183 N.J. at 564.

Release Act (NERA), N.J.S.A. 2C:43-7.2, for the lesser-included offense of aggravated manslaughter; a seven-year concurrent term for unlawful possession of a weapon; and a consecutive seven-year sentence, also subject to a NERA parole ineligibility period, for aggravated assault.

The trial judge applied aggravating factors one, three, six and nine, N.J.S.A. 2C:44-1(a)(1), (3), (6) and (9), to all counts, and applied aggravating factor two, N.J.S.A. 2C:44-1(a)(2), separately, to the aggravated assault charge.

The court attributed "somewhat medium weight" to aggravating factor one, "[t]he nature and circumstances of the offense," N.J.S.A. 2C:44-1(a)(1), noting the shots were fired at a moving target—the Taurus—in the dark in a residential neighborhood, where numerous young people congregated. The judge also noted: "the higher the degree, in this case, the first and the second degree, the greater the need for protection for the public, and more the need for deterrence of others." The judge concluded:

> It is senseless to fire the firearm. But it is more illogical, senseless that a moving target and shots are being fired. . . . [I]t was quite disturbing to see . . . Burroughs takes a shot, and he's on the ground. Not you, others. I couldn't confirm who it was. At least one person came in, looked at him, and walked away.

With respect to the aggravated assault of Chambers, the court attributed "somewhat low weight" to aggravating factor two, "[t]he gravity and seriousness

29

of harm inflicted on the victim," N.J.S.A. 2C:44-1(a)(2), due to the severity of the injury she suffered.

The judge gave "somewhat medium weight" to aggravating factor three, "[t]he risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3), recognizing defendant had accumulated a criminal record consisting of six prior arrests, one municipal court conviction, and six felony convictions in a recent fifteen to sixteen-month span. Defendant was also on probation when the shooting occurred, had a two-month history of employment, and a history of marijuana use. In addition, the sentencing court gave "very minimum weight" to evidence of defendant's gang affiliation, based on evidence that was ruled inadmissible at trial.

The judge noted various witnesses' mention of defendant's affiliation with a local street gang;[9] but acknowledged he did "not have any substantial[,] independent evidence as to the extent of . . . defendant's involvement in the Brick Squad[.]" Accordingly, the judge gave "very minimum weight" to defendant's gang affiliation in his analysis of aggravating factor three.

---

[9] A pretrial ruling barred the prosecutor from mentioning defendant's gang affiliation at trial.

The judge gave "medium weight" to aggravating factor six, "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses," N.J.S.A. 2C:44-1(a)(6), noting defendant had previous convictions of aggravated assault, resisting arrest, and four drug-related charges. The court attributed "medium to heavy weight" to aggravating factor nine, the need for deterrence, N.J.S.A. 2C:44-1(a)(9), noting defendant was convicted of both first and second-degree crimes, defendant's apparent disregard for the safety of others, and the need to deter the trafficking and use of illegal firearms.

Defendant asserts the sentencing court improperly relied on the degree of the offenses when analyzing factor one, noting the Legislature accounted for the seriousness of the offenses when grading them. Defendant also contends the sentencing court improperly relied on evidence of gang affiliation that was precluded from trial. Finally, defendant argues the court's reliance on factor two was misplaced, because the severity of the injury to Chambers was an element of second-degree aggravated assault.

Applying a deferential standard of review to the judge's sentencing determination, we find no error in the judge's identification and balance of the "aggravating and mitigating factors that are supported by competent credible

31

evidence in the record." State v. Grate, 220 N.J. 317, 337 (2015) (quoting State v. Lawless, 214 N.J. 594, 606 (2013)).

Recognizing the judge's application of aggravating factor one "must be based on factors other than the death of the victim and the circumstances essential to support a finding that the defendant has acted with extreme indifference to human life," State v. Fuentes, 217 N.J. 57, 76 (2014), we conclude the judge properly analyzed facts that went beyond the essential elements of the crime. Multiple shots were fired in the dark at a moving target in a residential neighborhood in an area populated with numerous bystanders. This combination of facts transcends the requisite basis for reckless indifference and buttresses the application of aggravating factor one. Defendant placed numerous people at risk of bodily injury or death by wantonly and repeatedly firing. See Lawless, 214 N.J. at 609-610 (2013) ("[C]ourts applying aggravating factor one focus on the gravity of the defendant's conduct, considering both its impact on its immediate victim and the overall circumstances surrounding the criminal event.").

We also reject defendant's argument that the judge impermissibly relied on the grading of the crimes in applying factor one. The judge simply quoted the relevant case law that framed his analysis: "[t]he paramount reason that the

[c]ourt focused on the severity of the crimes is to ensure protection of the public and deterrence of others. Thus, the higher the degree . . . the greater the need for protection for the public, and more the need for deterrence of others." See Fuentes, 217 N.J. at 74 (quoting State v. Megargel, 143 N.J. 484, 500 (1996)) ("[T]he paramount reason we focus on the severity of the crime is to assure the protection of the public and the deterrence of others. The higher the degree of the crime, the greater the public need for protections and the more need for deterrence.").

We determine the remainder of defendant's sentencing arguments to be without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2). We briefly note the low weight the judge attributed to aggravating factor two was warranted by the severity of Chambers's injuries that more than surpassed the statutory element of "serious bodily injury." N.J.S.A. 2C:11-1(b) (defining serious bodily injury as an injury "which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ"); see also State v. Mara, 253 N.J. Super. 204, 214 (App. Div. 1992) ("The extent of the injuries, which exceed the statutory minimum for the offense, may be considered as aggravating."). And, although the judge credited the testimony of several witnesses in finding

defendant's gang affiliation, see State v. Smith, 262 N.J. Super. 487, 530 (App. Div. 1993) ("sentencing judges may consider material that otherwise would not be admissible at trial, as long as it is relevant and trustworthy"), the judge attributed only "very minimum weight" to that affiliation because there was no evidence establishing the extent of his involvement. Moreover, defendant's lengthy record alone warranted the "medium weight" the judge attributed to aggravating factor three.

Defendant's argument with regard to mitigating factor five—"[t]he sentencing court was remiss in not relying upon mitigating factor N.J.S.A. 2C:44-1(b)(5)[,] where the State's theory of liability was one of transferred intent"—lacks sufficient merit to warrant discussion. R. 2:11-3(e)(2). There is no evidence either "victim of the defendant's conduct induced or facilitated" the commission of any crime. N.J.S.A. 2C:44-1(b)(5).

We also determine defendant's argument that the "court should also have considered the age of [defendant, nineteen,] at the time of the offense," is without merit. Defendant's reliance on Miller v. Alabama, 567 U.S. 460, 479 (2012), which held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," is misplaced. In considering the reach of Miller and other related decisions, our

34

Supreme Court recognized in the two underlying cases it considered in <u>State v. Zuber</u>, 227 N.J. 422, 448 (2017)—another case defendant relies upon—that the imposition on juvenile offenders of minimum terms of fifty-five years, in one case, and more than sixty-eight years in the other—"the practical equivalent of life without parole"—"trigger[s] the protections of <u>Miller</u>" under both the federal and state constitutions.  The sentence imposed here does not suggest a violation of these constitutional principles.  Unlike the defendants in <u>Zuber</u>, defendant does not face "potential release after five or six decades of incarceration, when they would be in their seventies and eighties[.]"  <u>Ibid.</u>

Finally, the judge properly applied the <u>Yarbough</u>[10] factors in imposing a consecutive sentence for the aggravated assault of Chambers.  As the judge

---

[10]  In <u>State v. Yarbough</u>, 100 N.J. 627, 644 (1985), the Court delineated factors upon which a sentencing court should focus in determining whether a sentence should run concurrent or consecutive:

> (a) the crimes and their objectives were predominantly independent of each other;

> (b) the crimes involved separate acts of violence or threats of violence;

> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

A-5491-16T1

noted, Burroughs and Chambers were in "two separate locations" when they were shot; Chambers was seated inside the BMW, and Burroughs was shot "on the sidewalk some ways away." Accordingly, the judge concluded, "[t]o issue concurrent sentences . . . would not adequately take into account the distinct nature of the two harms inflicted by the defendants."

"[A] trial court has the discretion to impose consecutive sentences in cases where . . . the only factor supporting consecutive sentencing is multiple victims." State v. Molina, 168 N.J. 436, 442 (2001). "Although that principle resonates most clearly in cases in which a perpetrator intentionally target multiple victims . . . it also applies to cases in which, as here, the defendant does not intend to harm multiple victims but it is foreseeable that his or her reckless conduct will result in multiple victims." State v. Carey, 168 N.J. 413, 429 (2001).

We perceive no violation of the sentencing guidelines; the aggravating and mitigating factors found by the judge were based upon credible evidence in the record; and the sentence imposed for these multiple crimes is not "clearly

---

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous.

36

unreasonable so as to shock the judicial conscience." <u>Fuentes</u>, 217 N.J. at 70

(quoting <u>State v. Roth</u>, 95 N.J. 334, 365 (1984)).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION